The case just argued will be submitted. The next case for oral argument is Salkin v. USAA Life Insurance Company. May it please the Court, my name is Julia Follansbee, appearing on behalf of Ellen Salkin. With me at counsel table is Travis Corby, who handled this case in the District Court. I'd like to reserve three minutes for rebuttal. I'll start with the California Supreme Court's Thompson decision and this Court's decision in Lettieri, which provided this Court's understanding of what Thompson means. Every reason this summary judgment needs to be reversed flows from these two decisions. Lettieri is a choice of law appeal in which this Court had to decide if California and New York law differed regarding the method by which factual issues about material misrepresentation are determined, where both states' substantive law allows rescission of a life insurance policy if there has been material misrepresentation. Both Thompson and Lettieri state that the burden of proof of misrepresentation lies with the insurer and that if the beneficiaries come forward with plausible evidence disputing the alleged false statements, these disputed facts must be submitted to a trial fact. But instead of following this law, the District Court decided that Thompson needed a limiting principle because it swallows entirely the rule that any material misrepresentation is a basis for rescission. But this was error because the District Court had to follow Thompson as the law pronounced by the California Supreme Court in this diversity case. Thompson acknowledged the rule referred to, Section 331, and all the other relevant insurance statutes and case law existing in 1973, and still decided that disputed facts regarding misrepresentation go to a trial fact. Lettieri agrees this is now California law. The District Court was bound to follow Lettieri as well as Thompson because Lettieri is the law of this circuit. It does no good for USAA Life to contend that Lettieri is dicta and not precedent simply because it is a choice of law appeal. The Lettieri panel confronted the germane issue of disputes about how misrepresentations are resolved, and it did so in the insurance context and resolved it after reasoned consideration in a published opinion, which is all that was required for Lettieri to become binding precedent. Thus, this court must view any grant of summary judgment without submission to a trial fact in the face of disputed false statements with great skepticism. This brings me to the next topic, which is the lack of a cross appeal by USAA Life, where USAA has presented inadmissible hearsay to you as undisputed fact in this appeal of a summary judgment. The District Court did not consider the medical records of the doctors who treated Salkin as trustworthy evidence because it concluded they were inadmissible hearsay. This ruling, which was the very first issue the court decided, happened because USAA failed to authenticate these records with the testimony of a custodian or other qualified witness as to their reliability as business records as Federal Rule of Evidence 8036 requires. Counsel, why wasn't the evidence that the judge did consider enough to find a material misrepresentation? Well, the only thing that she found was about the answer of no to the medical records, and that's a very interesting qualification here because if you look at ER 21, where the District Court says this, and I'm reading from her opinion, she says, most critically, Dr. Salkin volunteered that he had no medical records at all. He did so in a peremptory response to a question about whether USAA had his authorization to request medical records from any healthcare providers who treated him. And then she said answering no to this is a question that was yes or no, but what happens here is if you look at the actual interview, and it starts on page 140 of the second ER, he is asked by the interviewer, have you had chest pain, high blood pressure, blah, blah, and he says, okay, I have a history of high blood pressure. And then she goes on and asks him many, many questions about his high blood pressure, at least 18 questions, and they're talking about this, and then she asks him a few other questions, and then at ER 147, she says, and some of your answers indicate that USAA Life Insurance Company will need to obtain a copy of your medical records to better evaluate your application. And he says, well, I don't have any medical records, following this long discussion about his high blood pressure. Now, what the judge ruled back at ER 21 is that in the entire context of the conversation, he should have realized that she was asking him about other doctors, but the entire conversation wasn't over, because the very next thing the interviewer asked him was, well, you know, I have to read this, I have to paraphrase it. So she's reading off of a script, and then he realizes she's asking about other doctors, and he says, yes, you can have these records. So I think that it's disputed as to exactly what he thought of this conversation in the context in which it occurred, not the entire conversation. And so what is disputed here is what he thought she meant by your medical records after a long discussion about his blood pressure. He's treating himself, and he doesn't have any. Look at page ER 142. 142. He asked, what is the name of the doctor or facility named that would have a record for this? The answer was, let's see, I'm a doctor, so I doctor myself. Yes. The next question, so you have your own medical records for your high blood pressure? Answer, I don't have any records, no. The next question was, what doctor or facility would have the records for your blood pressure? And the answer was, nobody. No doctor, no. Yes. Well, it seems very clear there that they're asking for the records, not just whether they're in his possession. And I'd like to give you an opportunity to respond. Well, they're asking him, does any other doctor have it? And he's saying, no, I keep them myself. And that was the entire conversation about the blood pressure because he's treating himself. And she's asking about other doctors, but he's saying, no, I treat myself. And then she goes on to say, what about your medical records at ER 147? And he says, I'm doctoring myself, because he's listening to this conversation that they're having before, and he's just repeating what he told her. And in truth, there are no other medical records for his high blood pressure. There are none. So the other thing about that question is that, is that sufficient to grant summary judgment? And Rule 56 says if there are any issues left for a dispute of material fact, then you don't grant summary judgment. And certainly there are other issues of material fact here having to do with what the underwriter was doing when she issued this policy, when she saw these abnormal tests. So I think that, you know, there are many other issues here, and that wasn't sufficient to simply rescind. And, again, it's an ambiguous question in the context of that. She interpreted it one way, but a jury might interpret it another. And that, I think, is what we're getting at. So the other thing that happened here is that USAA says that because the district court said these records, the inadmissible medical records, were more grounds upon which summary judgment could be granted had they been authenticated, this entitles them to argue without cross-appealing. Well, this is wrong because USAA proclaims these medical records were undisputed, but the Salkins disputed everything that was in these medical records. And because there's this dispute under Thompson and Lettieri, a jury gets to decide these issues. There's a little bit of ambiguity in the record about the medical records. Am I correct that the medical records that were offered in support of the summary judgment motion were obtained by the insurer directly through this release rather than being produced in discovery? Well, I believe that what happened is that Mrs. Salkin, when he was diagnosed with prostate cancer, was asked to produce some records of his insurer. And somehow through that, they discovered that all these medical records existed on Dr. Salkin. I'm asking a different question. I'm asking specifically about the records that your client objected to, the ones that were submitted in support of the summary judgment motion. And the question is, how did the insurance company get them? Am I correct that the insurance company obtained them themselves by using that release the widow gave? I would imagine. Excuse me, so my question is, as opposed to your client producing them in the course of discovery? I think they were obtained by the insurance company under the authorizations. Thank you. Yeah. Okay. I think that the other many genuine issues of material fact that remain for trial that we have here are that, again, Thompson states that the burden of proving misrepresentation rests with the insurer. And this is what the district court never seems to have come to grips with because it never understood the significance of Thompson. And the court never even mentions the evidence that we put forward that disputed what the underwriter's reasons were for rescission. We have the Federici and the Walsh declarations that support an inference that the underwriter ignored the abnormal test results in her file that a jury could find should have received her utmost attention as a serious risk to Dr. Salkin. And that risk, we say, was rather obvious had she looked at the file. Yet, in order to justify rescission, the underwriter puts great emphasis on the alleged abnormal tests that were discovered after they were checking on the claim and it caused her to rescind the policy. And she says in her deposition that without the later discovered alleged misrepresentations, she didn't have enough to assess the complete risk of insuring Dr. Salkin's life, and she says he was an unacceptable risk because of the need for further treatment and follow-up. But since we know there were seriously abnormal tests in her file in the pre-issuance stage of this underwriting, one which correctly indicated that Dr. Salkin was at a risk for prostate cancer, this is entirely contradictory testimony, and that goes to the underwriter's credibility. And as Thompson observes, the post-mortem testimony of an insurance agent need not be believed, and matters of credibility go to a jury. So even if an underwriter under California law section 334 may subjectively say after the fact what the reasonable and probable effect of a misrepresentation would have had on her pre-issuance underwriting, whether facts like these PSA levels showing just as bad, if not worse, risk to Dr. Salkin's life and that they were in her file, her credibility is on the line and is not a matter for a court on summary judgment. We could talk about, at length here, about Dr. Salkin's deposition testimony on his deathbed, disputing what was said in these medical reports, but again, that's the admissible hearsay, and they're not reliable, and so I think that they cannot be considered. And so that's what I have for now, and I'd like to reserve the remaining time. Thank you. Thank you. May it please the Court, Margaret Levy, appearing on behalf of the defendant and aptly USAA Life Insurance Company. As Judge Phillips stated in her order granting summary judgment, USAA Life properly rescinded this life insurance policy based on the material misrepresentations in the application. Both the ones that she ruled were admissible in terms of the testimony of Dr. Salkin, in which he admitted having an MRI, he admitted that he had been treated by doctors, and he admitted that he had a stress test, and he admitted that he had been treated by doctors. You're now speaking of his deposition testimony. I'm now speaking of his deposition testimony. That's correct. So based on his deposition testimony alone, the misrepresentations were material, and they were sufficient to justify the rescission. The case law relied upon by both parties is very clear that materiality is subjective, and that when materiality or a declaration from the underwriter stating that the representations or the misrepresentations were material is uncontroverted, then that is dispositive of that issue. And that's what we have here. Appellant attempts to deflect the court's attention by arguing about what was disclosed, and that that should have been material, and that we never should have issued the policy in the first place. But that argument makes no sense whatsoever, because if the policy was never issued, we wouldn't be here today at all. The concern in all of the cases state this is not what was contained in the representations, but what was omitted or concealed, and Dr. Salkin clearly concealed his medical history. Well, let me ask you this question. If the insurance company files showed that they had information that Dr. Salkin had an incurable disease and was likely to die within the next two years, and yet they issued a policy, and then they said, well, he never told us that he was under treatment for a cold, and for that reason we wouldn't have issued the policy, are you required to believe that? And is the evidence they have in the file, doesn't that go to show when they would issue a policy? Well, if it were the court's example, a cold, I would certainly agree that that's a nonessential and nonmaterial type of illness, but in this case... But, if the insurance company witnessed, then said, well, if we had known he had a cold, we wouldn't have issued the policy, and that's the testimony. Are we required to accept that testimony and disregard the facts in the company's file? Well, Your Honor, the insurance code says materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due in forming his estimate of the disadvantages of the proposed contract or in making his inquiries. I would agree with Your Honor that if an underwriter said, well, if we had known he had a cold, we never would have issued him the policy, they would have a hard time proving that through their underwriting guidelines, but in this case, we don't have that situation. We have the deposition testimony of the underwriter, we have underwriting guidelines, and we have material misrepresentations regarding an MRI, regarding a stress treadmill test. Well, at some point, now you're talking about information the district court didn't consider, so you have to be careful to segregate what was really before the district court, please. And if you could focus on Judge Reinhart's question, because I think it's a really good one. The nuance that you're suggesting now, which I appreciate your candor, it is not contained in your brief. If it was, I sure missed it. What I understood from your brief is that you have this declaration that says we wouldn't have insured this person had we known then what we know now, period. So that's why he's asking the question. Right. And I think the answer to that question is found in the case law that says materiality is in essence what the insurance company Without limitation? Whatever the insurance company says is important to the insurance company? But the statute puts that limitation when I said probable and reasonable. I think that is, by the probable and reasonable, I think we have that limitation in the statute itself. All right. That's where we get it. And so then your argument in this case is just that this doesn't, the facts of this case don't trigger that questionable area where it might have to go, where materiality has to go to a jury? That's correct. Because as Your Honor pointed out, these misrepresentations were not the nonessential type that Judge Reinhart suggested. Obviously an extreme example. But the question was, isn't it material to say, well, they did give him a policy despite knowing this? Isn't that a matter for the jury to consider as well, that they were not so careful about when they gave him a policy, but they were more anxious to get the money from a policy? I mean, that's the argument from the other side. Isn't that, given the information they had in their file, doesn't that throw into question when they might give a policy, even though the person concealed some information that may not have been as important as the information that they knew when they did issue a policy? Your Honor, I don't believe that it does, because the case law holds that the company has the unfettered discretion to determine who it wants to insure and what risks it's willing to take on. That is stated in the case law that we cited in our brief. And also it's noted in the underwriting notes, the PSA result is noted. It says it's within the guidelines of the Swiss Re underwriting manual. They note his other tests. They were considered, obviously. So was the EKG that Dr. Salkin had in connection with his initial paramedic examination for his first application. And they graded the policy, in other words, increased the premium, determined that it was an increased risk based on the right bundle branch block, but not based on the PSA or not based on other things. That is up to the discretion of the underwriter, and the case law says this. If Dr. Salkin had not misrepresented his medical history and he died of prostate cancer, we couldn't say, oh, he had an elevated PSA, we're going to rescind the policy. We knew that. We took that risk. We accepted that risk. But we can't accept a risk that we don't know about. And Dr. Salkin was a physician. He understood the questions in the application. Even a layperson can understand questions that say, have you had a diagnostic test? Have you seen a doctor? But every time we tried to get this information, he blocked it by saying, I never saw a doctor. I don't have any records. There was no way to get this information. And USAA Life made a decision based on the information that it had that it would issue the policy, but at an increased premium rate based on the right bundle branch block. Had it known all of the additional information that he failed to disclose, it never would have issued the policy in the first place. Did it increase the rate for the PSA? No, they did not. They increased the rate for the high blood pressure and for the right bundle branch block. Those were the considerations that went into the increased rating. But they noted in the underwriting notes, which are in the record, they noted the PSA, they noted that it was within the guidelines, they noted the other lab test results, and noted that they were acceptable. So in other words, it wasn't as if they overlooked them or didn't notice them. It was a decision made by them within their rights to make that decision that we are going to accept that risk and take that risk. Counsel, it would be helpful to me, forgive me for interrupting, but I'm worried about your time there. Well, it would be helpful to me if you would set aside all the information that the district court found improperly submitted. She did not consider those medical records. And just basing your answer on what she did consider, could you please identify for me the omissions or the misstatements that your client claims were material? Right, that were not included in the medical records obtained by the company. What the judge excluded, I don't want to hear about. Just from what she considered, please. Her number one consideration was his statement that there were no records and that he had not been treated by any physician. That in and of itself is a misrepresentation. What's the next one? The next one is the MRI. That in and of itself is a misrepresentation. Okay, so he said in the interview he hadn't had a test, and then the way you know that he had had the MRI is the deposition? Deposition testimony. So both of those were considered by the district court judge? They were. Okay. Yes. And the next one, please. The next one considered by the district court was the stress test. He admitted in his deposition that he had a treadmill, and he specifically testified about the treadmill. And in talking about going back to the MRI, when I questioned him in his deposition, he admitted that the doctor told him that there was evidence of the infarcts, and lacunar infarcts. Dr. Salkin chose in his deposition testimony to minimize all these things, but as the case law states, it's not up to him to decide what is and isn't important. The fact that the company ---- Counsel, I know I'm interrupting, forgive me, but are you done with your list? Is it those four facts? I know there's one other, and it will come to me, but I know that there were four totally that she talked about that were actually in the deposition testimony. Oh, he admitted that he was treated for obsessive-compulsive disorder. However, he denied that that was a mental or nervous condition. So, again, Dr. Salkin took it upon himself to interpret the questions, but as Judge Phillips pointed out, that was not his promise to do so. He was asked specific questions. Did you have a test? Did you see a doctor? Not how important was it, how significant was it? So it was up to him to tell the truth, and the company had the right to rely on the truthfulness of his statements in the application. Is opposing counsel correct that the district court judge relied on the single misrepresentation, the statement that there were no records? No. That is not correct. That is not accurate. I just listed it was the MRI with the lacunar infarcts. It was the fact that he stated there were no records. It was the treatment by a psychiatrist for obsessive-compulsive disorder, and then although I'm not sure whether Judge Phillips mentioned it, I do know that in the record in his deposition testimony that is before the court, he admitted that he had the treadmill stress test also. So there are, even without looking at the medical records that the court obtained, it is clear that there were material misrepresentations, that the company had the right to rely on his answers, and that they properly rescinded the coverage. And if I might just very briefly address, Your Honor, the issue of the admissibility of the records. It's our position that the records are admissible to the extent they show these are the records that the company obtained. These are what the company got pursuant to the authorization, as Your Honor pointed out, when you were questioning opposing counsel. They were the records that were sent and received. Presumably. The district court recognized that, and she said I'm not going to look at the content, but apparently I think impliedly considered their existence. Right. And I think that is how she could say there was a misrepresentation that there were no records, when in fact we received records. Right. And opposing counsel's response, of course, is that he actually said he had no records, which is arguably an ambiguous statement. I don't believe it is ambiguous. As Your Honor pointed out, he said there are no records. No records exist. There is no doctor that has records. I haven't seen any doctors. You think he said no records exist? You think he used the word exist? No, he didn't use the word exist. But, Your Honor, in the excerpts of record at 73, there is a consent form that he filled out and signed, and where it says name of physician, he wrote in none. Yes. So there is no way that USAA Life could have obtained additional information and could have obtained additional records. And as opposing counsel pointed out, when he did disclose his high blood pressure, there were 18 follow-up questions. I came to the same count. Had he disclosed this other information, there would have been follow-up questions just as there were with respect to high blood pressure, and there would have been records that would have been obtained. And based on the testimony and the declaration of the underwriter at USAA Life, no policy would have been issued. First of all, what was in the underwriter's file was not just a PSA level of 4.28 that was judged okay by some guidelines that we've never seen. What was in there was also a record that showed that that PSA level had risen from 3.32 to 4.28 over an eight- or nine-month period. And they have never said or acknowledged that right in their files was acknowledgement of a rising PSA, which is the leading indicator of prostate cancer. Now, as to this idea of Dr. Salkin misrepresenting things, Thompson is very clear. Questions concerning illness or disease do not relate to minor indispositions, but are to be construed as referring to serious ailments which undermine the general health. And Dr. Salkin testified that he was never, as it's stated in the brief, diagnosed with depression, and he was never diagnosed with morbid obesity or sleep apnea or these other things. And even so, if the medical records reflect that, they are hearsay, and they should not be considered by this court. One other point here is that you might ask, well, questions concerning illness or disease do not relate to specific tests. But let me make an example like Judge Reinhart's. If I have a cold and it's very bad and I go to a doctor to see it, but it's not life-threatening, am I likely to tell an interviewer every doctor I've ever gone to for what is a minor ailment? Now, there's some statements that they have made that because he's a doctor, he has no right to throw his own judgment out there. And the court even said that. His judgment isn't even important here. It's irrelevant. But when you look at Thompson, even if he's a doctor, questions concerning illness or disease do not relate to minor indispositions. And who but a doctor is better able to decide whether questions relate to minor illness or disease? Nobody that I am aware of or have read about in case law has died of obsessive compulsive disorder. And I think that the court might want to consider what would have happened if Dr. Salkin had known about this PSA and had revealed it to USAA Life and they'd have issued the policy anyway. And then later they discovered all these other things and said, well, you know, we're going to rescind because of these things because you never told us about this, that, and the other thing. And so that's an interesting question, I think, that needs to be asked in your minds as you figure out what to do with this. And we hope that you will reverse this summary judgment because the law is so clear that when there are disputes like this, it goes to a jury. Thank you. Thank you, counsel. Case just argued will be submitted.
judges: Sedwick, Reinhardt, Christen